The Sellmayer Packing Company v. Commissioner.
Sellmayer Packing Co. v. Commissioner
Docket No. 431 P.T.
United States Tax Court
1943 Tax Ct. Memo LEXIS 46; 2 T.C.M. (CCH) 1051; T.C.M. (RIA) 43500; November 30, 1943
*46 J. Gilmer Korner, Jr., Esq., and Stanley Worth, Esq., for the petitioner. Jane M. Pierce, Esq., Irene F. Scott, Esq., and William V. Crosswhite, Esq., for the respondent. OPPER
Memorandum Opinion OPPER, Judge: Petitioner seeks a refund of $57,657.44 processing tax paid by it during the period February, 1934, to February, 1935. The basic question is whether petitioner absorbed the processing tax or passed it on to its customers. The presentation of the case makes the admission of secondary evidence a controlling issue. At the hearing a ruling on a motion of respondent to strike testimony and exhibits on behalf of petitioner based upon secondary evidence was reserved. [The Facts] Petitioner is a Maryland corporation organized in 1926. It succeeded to a business which commenced in Baltimore, Maryland, about 1870, and engaged principally in the slaughtering of cattle and hogs and to a lesser extent, of sheep, and the sale of the meat and processed articles. Petitioner ceased active operations in 1937. At the time the processing tax on hogs became effective in November of 1933, petitioner's plant was closed due to a fire in September of that year. The plant remained closed because *47 of the fire until the latter part of February, 1934. Except for relatively few hogs purchased locally, petitioner purchased its hogs in Chicago and St. Louis. The hogs purchased were light in weight and of a poor grade to meet the demands of petitioner's customers for a cheaper grade of product. Because of the inferior quality of the hogs, lossees en route and by condemnations were considerably higher than if a better grade hog had been purchased. Petitioner's trade was confined to the State of Maryland, principally Baltimore. Its plant was not federally inspected. Every load of hogs received by petitioner was the subject of a cutting test in which six hogs selected as being representative were slaughtered and the weight of the carcass and cuts or parts determined in relation to the pre-slaughter weight. Price lists were issued about once a month for the use of petitioner's salesmen and employees. The prices were changed frequently, though not necessarily in the same proportion for each item, the changes being shown in pencil. Petitioner tried to consider the processing tax as one element of cost. It also took into consideration the cost of the hogs, the state of the market at the *48 time, and the effect of the weather. The business was highly competitive, both as to the purchase of live stock and the sale of finished products. Generally petitioner was unable to realize its price-list price and the prices obtained by petitioner for the various cuts of pork had no constant relationship to the prices shown on the price list for the same cuts. Petitioner's tax period herein involved covered the months of February, 1934 to February, 1935, inclusive, for which period it duly filed processing tax returns, showing the total tax attributable to hogs processed as $61,046.16. Petitioner was allowed refunds or credits totaling $4,022.20 by reason of sales to certain charitable institutions, leaving as the net amount of tax paid by petitioner the sum of $57,023.96. At least some of the $4,022.20 was refunded or credited by petitioner to the institutions. Petitioner filed a claim for refund of processing tax on June 30, 1937, in the amount of $57,657.44. On September 15, 1939, it filed an amended claim for refund of processing tax in the amount of $17,349.01. By letter dated June 30, 1942, respondent disallowed petitioner's claim for refund. During the tax period petitioner *49 processed 27,171.18 cwt. (pre-slaughter weight) of hogs. The cost of the hogs processed was $133,308.49. For the base period the cost of the hogs processed was $396,894.49. The number of cwt. (pre-slaughter weight) processed during the base period, computed by allowing for the same percentage of loss in shipping and through condemnation, was 68,922.71. Other facts not recited above, but stipulated, are found accordingly. [Opinion] Disposition of this claim for refund of processing taxes resolves itself in the final analysis, though somewhat indirectly, to a question of credibility. In order to prove the gross sales value of its pork products, for purposes of establishing its absorption of the tax and the consequent propriety of a refund, petitioner offered at the hearing a series of computations prepared by an accountant whom it had employed. Admittedly, the basic data for the preparation of these schedules were the original sales invoices which it seems were concededly available at the time the schedules were prepared. The offer of the secondary evidence in the form of these schedules and the effort of petitioner to account for the originals and thus justify admission of *50 the evidence is the pivotal point of the case. Petitioner several times concedes in its brief that elimination of this evidence would leave petitioner "in the position of having failed to establish an important element in the statutory margin computations, and [it] could not hope to obtain a recovery." As a consequence, respondent's motion to strike this evidence, which was adopted as the mechanical method of raising the question so that the evidence could become a physical part of the record, and upon which decision was reserved at the hearing, constitutes the basic or at least the primary issue in the proceeding. The ruling on the motion and the consequent admission or rejection of the evidence depends on the extent to which we are satisfied that the attempt to account for the originals has been successful. Petitioner's side of the story is represented for the most part by the testimony of two of its officers and particularly of that of its president. An inability to credit their statements and the theory which they embrace would make it impossible to grant that petitioner, the proponent of the secondary evidence, has sustained its burden of showing that the originals could not *51 be produced as a result of accident or mistake. ., , affirmed (C.C.A., 3rd Cir.), ; see ; . The story related by petitioner's president was that the course of certain structural alterations required the removal of the contents of their record room in which the invoices had formerly been kept. Upon his instructions these papers, along with the rest of the contents of the room, were to be removed to another previously used as an ice box. According to his original story on direct examination these instructions were not followed but instead the records were removed to a dump and consequently destroyed. The testimony was: Q. Are we to understand then that all of the books and records that were in this record room have been destroyed? A. Yes. (Italics added.) The discovery that the instructions had not been complied with and that the records in question were accordingly unavailable *52 was originally stated on cross examination to have been "about two months ago," which would have been approximately the end of November, 1942. As the hearing developed and as further witnesses connected with the asserted removal were produced and examined, it became apparent that such details could not be reconciled with other phases of petitioner's assertions. For example, one of the laborers engaged in the removal and whose acquaintance with the importance of the records was emphasized, testified in effect that he believed the instructions were being faithfully carried out, a conclusion which was justified by his statement that: Q. You knew some papers did go into the ice box. A. Some boxes, yes. Q. Boxes? A. Yes, sir. Q. You don't know whether there were papers in them or not? A. Yes, lot of envelopes and papers. This, of course, was inconsistent with the statement that all the records had been destroyed, and petitioner's president subsequently testified that "there were some records making [relating] to the finance company." In the meantime, also, the accountant had testified that after the removal to the ice box he had made a search for some records, which, although unsuccessful, *53 disclosed that certain other and irrelevant records were present in the ice box. Nevertheless, when at petitioner's direction a search of the plant was made in the course of the hearing by manifestly disinterested agents, no records whatever were discovered which would have accounted either for the president's statement respecting "the finance company" nor for the discovery by the accountant. Similarly, as to the time of the discovery, petitioner produced, as an assertedly hostile witness, a former employee who had been charged with the removal of the records. He insisted that his instructions had been faithfully executed and that the records in question were moved to the ice box and remained there when he left petitioner's employ early in October, 1942. Petitioner's president, in denying these statements, advanced the loss of the records as a cause for this employee's dismissal. This, of course, necessitated the fixing of a date for the discovery that the records were missing at some time earlier than the dismissal, and petitioner's president then changed his testimony accordingly. But that, in turn, conflicts with statements of the accountant that while there seemed to some question *54 as to the presence of all the records his first information as to complete disappearance was about the middle of November, 1942, and with the testimony of the two laborers who fixed the time when they were first approached by petitioner's president in an effort to discover the records at some time in November or December, 1942, notwithstanding that the president's testimony was that his original effort to assure himself that the records were missing included questioning these witnesses. There are many other respects in which the record discloses contradictions within the testimony of the principal witnesses for petitioner and conflicts between their testimony and that of disinterested witnesses, to say nothing of the categorical statements of other witnesses whose bias against petitioner's officers was evident and whose stories, if believed, would definitely support the conclusion that the records in question have been deliberately withheld. Suffice it to say, however, that without the testimony of the two officers of petitioner, it is impossible to conclude that the records are not still in existence. And we are unable to rely upon that testimony, notwithstanding favorable character *55 evidence of a highly imposing nature which, were the record less conclusive, might serve to tip the scales in the witnesses' favor. And even if the documents were not available, their deliberate destruction to prevent production at the hearing is the only other logical view. Such a disposition would be equally fatal to the receipt of secondary evidence. ; see ;; Jones "Evidence," 3rd ed., p. 322. The conclusion that the invoices were still in existence or, if not, that they were deliberately destroyed by petitioner is vigorously resisted on the strength of the assertion that it was in petitioner's interest to discover and produce the documents and of the denial that there could have been a reason or motive for the failure to produce them if still available. The documentary evidence, however, completely destroys the foundation for this argument, for if in fact the invoices in question included a considerable proportion which would appear on examination to be fictitious, an explanation is immediately furnished *56 for the failure to produce at least those invoices. And if without them the sales prices claimed by petitioner could not be supported by the remaining invoices, there would obviously be less difficulty in explaining the failure to produce all the invoices than the failure to produce merely the ones which resulted in the favorable figures. There is, of course, no direct evidence of any motive of this sort, but petitioner's argument is such that it must yield to the discovery of a reasonable hypothesis. If the withholding or destruction of the invoices is susceptible of an explanation reasonably furnished by the record, it can no longer be said, as petitioner insists, that the assumption of voluntary non-production is unreasonable for lack of any possible benefit to be derived from it. That such unexplained alterations in petitioner's favor would have appeared upon the production of the documents which supported the original claim is demonstrated almost beyond a possible doubt by the documentary evidence. Upon examining the invoices in detail, in connection with an audit of the original claim, the revenue agents, according to their testimony, selected certain examples which were said *57 to be typical for the purpose of further inquiry. After that inquiry had been abandoned by reason of the asserted disappearance of critical evidence, and the claim had been disallowed, the agents continued to retain in their possession the illustrative documents, and these were produced and submitted in evidence at the hearing. One example of the type of alteration shown by several of these documents will suffice. Petitioner's practice was to prepare a sales invoice and a delivery slip, the former showing prices and the latter, apparently for the purpose of obtaining a receipt for delivery, showing dates and quantities. The ingenious device which was apparently the purpose of the alterations in question was to add to the delivery slips a set of prices in petitioner's favor. Presumably in order to avoid the appearance of duplication, the dates on the original invoices were changed so that the delivery slips appeared to deal with different sales. A closer examination, however, shows a correspondence between the quantities on invoices and altered delivery slips which would make it a coincidence too miraculous to be believed that the same items in the same odd quantities were delivered *58 to the same place within a few days of each other and that the prices on all items were the same except those which petitioner would benefit by having different. It became evident that the retention of the slips in question by the revenue agents was entirely unknown to the officers of petitioner and that the production of these documents at the hearing came as a complete surprise. The officers were given every opportunity to explain the alterations, but professed to be unable to do so. The existence of these examples being unknown, it is something less than difficult to postulate that the purpose of non-production was to remove all possibility that evidence of such alterations would be forthcoming. And, of course, the existence of the accountant's report, based presumably on these very invoices, would give the petitioner the foundation for advancing secondary evidence which, if received, would suit its purpose exactly as well as the original. No suggestion is made that the accountant's report was deliberately false. It was not within his province, as he himself insisted, to question the figures furnished him by his employer. But that neither increases the reliability of the result *59 which he reached nor serves to discount the evidence of motive which the record supplies. We have accordingly reached the conclusion that the original documents have not been satisfactorily accounted for and that secondary evidence is consequently inadmissible. The motion to strike, upon which decision was reserved, is granted, and with the evidence so dealt with excluded from the record and petitioner being thus concededly unable to sustain its position. Decision will be entered for respondent.